**TELE–COMMUNICATIONS OF KEY WEST, INC., Plaintiff,**

v.

**The UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 83–3722.**

United States District Court, District of Columbia.

Dec. 28, 1983.

Jay L. Cohen, Washington, D.C., for plaintiff.

Stuart Newberger, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiff, Tele-Communications of Key West, Inc. (TCI), seeks an order from this Court preliminarily enjoining the United States from refusing it full access to Homestead Air Force Base after December 31, 1983, and from requiring TCI to remove its property from the base promptly after that date. Defendants have moved to dismiss. The issues presented are now before the Court after full argument and submission of briefs and affidavits.[1]

---

1. TCI knew as early as August that it was not the successful bidder, but delayed bringing the present suit until December 13, awaiting defendants' response to a request to be allowed continued access in order to compete for individual subscriptions. Oral argument was set for December 27, allowing the government sufficient time to respond to plaintiff's motion for a preliminary injunction.

TCI is currently the sole cable television company serving Homestead Air Force Base, having been granted access to the base pursuant to an exclusive long-term contract which expires on December 31, 1983. Acting under the authority of Air Force Regulation (AFR) 70–3, the government in mid-1983 solicited bids for a further exclusive 10-year contract to commence at the expiration of plaintiff's contract. The bid solicitation outlined procedures for evaluating bids based on cost and the availability/variety of programming, with the latter factor weighted according to the preferences of base residents as determined by an opinion poll. Competitive bids were received from eight potential cable television suppliers. The winning offer was submitted by International Cable Consultants (ICC); plaintiff's offer was ranked last of the eight bids submitted. On August 17, 1983, ICC was awarded a 10-year franchise agreement, which granted it the exclusive right to enter the base for the purpose of providing cable television service to base facilities and to individual dwellings on the base.

Although it lost the bid, TCI seeks to continue to solicit and serve existing and future subscribers using the cables and facilities it was allowed to establish on the base under the prior contract. It does not challenge the bid process directly, however, but instead contends that the First Amendment to the Constitution guarantees it continued access to the base and that the Air Force's order directing TCI to cease operations and remove its cables and equipment from the base at the expiration of its current contract violates its rights of free speech and due process, as well as its rights under the Sherman Act and 26 U.S.C. § 240, which governs easement rights on military installations.

Homestead Air Force Base, located approximately 35 miles southwest of Miami, Florida, is entirely dedicated to military purposes. Three F–4 fighter-bomber squadrons are assigned to the base. The base serves as an air crew training center and is also charged with the air defense of southern Florida. Access to the base is restricted and a pass is required to enter the base.

Cable television can serve the base only by hanging cables on utility poles the Air Force has erected along its right-of-ways. Individual subscribers are reached by use of "drop cables" which run from the main cables to individual residences. These main cables and drop cables are installed and maintained by the cable company at its expense. Presently TCI has such cables in place, and ICC is in the process of installing its own separate cable system on the same utility poles. In addition to its cable equipment, TCI currently maintains a physical plant on the base which occupies approximately one-third acre of government land.

■ The Court readily accepts TCI's contention that as a provider of cable television it enjoys the protections of the First Amendment. *Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). While, as the government points out, TCI currently produces no original programming but simply serves as a "conduit" for material produced by others, it has the potential to create original productions and, at the very least, performs the editorial function of choosing which programs of existing broadcasters it will provide to its subscribers. Moreover, while its programming selections largely duplicate that which ICC intends to provide, TCI offers at least one distinctive religious channel not supplied by ICC and apparently desired by some of its present subscribers.

Starting from this premise, TCI argues that it has a right to continued access to the base in order to provide cable television to any subscribers it can enlist. TCI suggests that the present situation is no different from competition between two newspapers, *see Home Box Office*, 567 F.2d at 46, and that the base's utility poles and other facilities can bear the burden of two cable systems as easily as one. While plaintiff's argument is superficially appealing, how-

ever, it is inconsistent with established First Amendment precedents.

■ Plaintiff seeks access to a military installation dedicated to military use. The government clearly enjoys broad power to regulate access to military bases, even where First Amendment interests are involved.

A necessary concomitant of the basic function of a military installation has been "the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 893 [81 S.Ct. 1743, 1747, 6 L.Ed.2d 1230] [1961]. The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically and constitutionally false.

*Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976).

■ Unlike delivery of newspapers to a military base, granting access to multiple cable television companies would involve significant burdens on the military installation and its mission, and would negate legitimate advantages the Air Force enjoys as a result of limiting access to a single such cable television firm.[2] The simple physical intrusion of a cable television operation onto land dedicated to military use is substantial. *See Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 127 (7th Cir.1982). This intrusion is lessened and better controlled by limiting access to a single firm. Other government objectives are also enhanced, including base security, morale, and reduction of costs to the government and to military personnel. If multiple cable operators were permitted, the Air Force would have to pay for additional contracts for the base TV channel and emergency over-ride capa-

bility it considers important to its mission. In the Air Force's view, permitting multiple cable operators onto the base rather than soliciting competitive bids for the rights to an exclusive franchise would also raise costs to individual subscribers, thus implicating the military's interest in the morale of those in its service. It is apparent, then, that the government's restriction on access to the base is grounded on legitimate and rational military objectives.

In furthering these objectives no undue burden has been placed on First Amendment interests. AFR 70–3 instructs each base commander to grant exclusive cable franchises so as to further the government's interest in morale and cost. The regulation recognizes that long-term, exclusive contracts are necessary to provide for amortization of the capital costs necessarily incurred by the cable provider at the lowest cost to the military and to its personnel.

Several aspects of the program also merit emphasis. The wishes and needs of the potential on-base subscribers have been taken into account by determining their preferences and by assuring receipt of numerous channels as well as access to specifically designated neighboring television stations. The availability of a large number of channels assures subscribers wide freedom of choice. The Air Force program is devoid of any intent to affect the content of any speech received. It is wholly content neutral both in intent and in effect. Moreover, no resident on the base is required to subscribe and accordingly those who wish to be free of television's frequent bad taste and intrusive advertising can maintain their right to be left alone. An on-base subscriber can disconnect at any time. Other types of speech, including newspapers, magazines, radio, and some broadcast television, are also completely available at all times.

---

**2.** Although plaintiff characterizes this suit as concerned only with the effect of access by one cable system versus two, at least eight cable companies have expressed an interest in serving the base. Plaintiff has offered no legal ration-

ale which would justify restricting access to two companies but not to one. The Court must consider the implications of opening access to multiple cable companies if plaintiff's position is accepted.

Inasmuch as the challenged denial of access involves a forum traditionally not open to public communication, rationally furthers a legitimate government interest, and is content neutral, it does not violate plaintiff's First Amendment rights. Plaintiff's claims under the First Amendment must therefore be dismissed.

 Plaintiff's remaining claims clearly lack any merit. No due process violation has occurred since plaintiff's First Amendment rights have not been infringed and there is no dispute over the conduct of the bid process itself. Plaintiff's claim under the Sherman Act is patently incorrect where, as here, the federal government acts in furtherance of its own interests. *See Community Communications Co. v. Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *Sea-Land Service, Inc. v. The Alaska Railroad,* 659 F.2d 243, 246 (D.C.Cir.1981).

 Finally, plaintiff's contention that denial of access to the base violates 16 U.S.C. § 420 is also incorrect.[3] The statute, which was clearly intended to grant certain powers to department heads and not to confer rights of access to particular individuals, does not require the department head to grant § 420 easements to all citizens, associations, or corporations; rather it allows a department head to award easements to *"any"* such individual or organization. Plaintiff's view that such an easement granted to a particular individual or organization must be open to all is simply not to be found in the statute. Nor has plaintiff's easement under its current contract been "annulled" in violation of the statute. Plaintiff's easement was limited to the 10-year period covered by its cable franchise contract, and thus simply *expires* at the end of 1983; it is not being annulled or abrogated in any way. In short, plaintiff's current easement rights are not being violated and 16 U.S.C. § 420 provides plaintiff with no additional rights.

**3.** Plaintiff also cites 43 U.S.C. § 961, which is substantially identical to 16 U.S.C. § 420. The two provisions differ only with respect to the

Plaintiff's claims therefore fail as a matter of law. Accordingly, plaintiff's motion for a preliminary injunction must be denied, and defendants' motion to dismiss must be granted.

type of government land which they cover; § 420 governs rights-of-way through military bases.