## TELE–COMMUNICATIONS OF KEY WEST, INC., Appellant

v.

## UNITED STATES of America et al.

### No. 84–5008.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 1984.

Decided April 2, 1985.

Jay L. Cohen, Washington, D.C., with whom Fred Israel, Washington, D.C., was on the brief, for appellant. Alan R. Plutzik, Washington, D.C., entered an appearance for appellant.

Stuart H. Newberger, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before WRIGHT and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This is an appeal from a District Court order dismissing, for failure to state a claim, a complaint filed by Tele-Communications of Key West, Inc. (TCI), a purveyor of cable television service. The issue presented is whether the dismissal was, in fact, proper under Federal Rule of Civil Procedure 12(b)(6). As discussed below, we hold that the District Court erroneously dismissed TCI's First and Fifth Amendment claims but properly dismissed TCI's statutory antitrust claim. Consequently, we affirm in part and reverse and remand in part.

## I. BACKGROUND

The undisputed facts underlying this case are as follows. For ten years, from 1974 through 1983, TCI (and its predecessor-in-interest) provided cable television service to Homestead Air Force Base in Florida. In June of 1983, however, the Air Force requested bids for cable television service to the base from a variety of parties. After receiving bids, the Air Force awarded an exclusive service contract to another company and ordered TCI to remove its cables and other equipment from

the base's cable television right-of-way by the end of December 31, 1983.[1]

On December 13, 1983, TCI filed an action in the District Court here requesting injunctive and declaratory relief. *See* Complaint for Declaratory and Injunctive Relief for Injury to First Amendment Rights, Fifth Amendment Rights and Antitrust Violations, Appendix (App.) at B. Specifically, TCI requested an order requiring the Air Force to allow TCI to leave its cable equipment where it was; such an order would have enabled TCI to continue service to the base. *See* Complaint, *supra,* at 9. TCI also requested that the court issue a declaratory judgment to the effect that any attempt on the part of the Air Force to prevent TCI from continuing to serve those on the base who desired such service would violate TCI's First and Fifth Amendment rights and the Sherman Antitrust Act. *See id.* at 8–9.

The same day TCI also filed a motion for a preliminary injunction, contending that it would be irreparably harmed if it was not granted relief by December 31, 1983. *See* Motion for Preliminary Injunction. The next day, December 14, 1983, a hearing on this motion was set for December 27, 1983.

On December 23, 1983, the Air Force filed a motion to dismiss TCI's entire complaint for failure to state a claim or, in the alternative, for summary judgment. TCI, on December 27, 1983, then filed an opposition to the motion to dismiss and a motion to strike the Air Force's motion for summary judgment or, in the alternative, for a discovery and briefing schedule for cross-motions for summary judgment. In these responses TCI asserted that the standard for dismissal had not been met and that the standard and procedures for summary judgment had not been complied with. *See* Opposition to Defendants' Motion to Dismiss Under Rule 12(b)(6); Plaintiff's Motion and Memorandum of Points and Authorities to Strike Defendants' Motion for Summary Judgment or, in the Alternative,

for a Discovery and Briefing Schedule for Cross-Motions for Summary Judgment.

On December 27, 1983, the District Court heard oral argument on TCI's motion for a preliminary injunction and on the Air Force's motion to dismiss. At that time the court observed that it would not dispose of the case on summary judgment because to do so would be unfair. *See* Excerpt of Proceedings at 3, App.L. The next day, December 28, 1983, the District Court issued an order and memorandum opinion dismissing the complaint and denying the request for a preliminary injunction. *See Tele-Communications of Key West, Inc. v. United States,* 580 F.Supp. 11 (D.D.C.1983).

TCI now appeals from the dismissal of its claims for permanent injunctive and declaratory relief, asserting that that dismissal was erroneous under the Rule 12 standards or as a summary judgment. The Air Force, on the contrary, defends the District Court's decision as procedurally proper and substantively correct. After determining the correct standard of review and evaluating the propriety of the District Court's decision, we will examine the District Court's disposition of each of TCI's claims.

## II. The Standard for Our Review of the District Court's Decision

TCI's first contention on appeal is that reversal is required because the District Court erroneously considered materials outside the pleadings in considering the motion to dismiss. The Air Force does not disagree with the proposition that the District Court had such external materials before it at the time it was contemplating the motion to dismiss; the Air Force explains this phenomenon by noting that TCI's request for a preliminary injunction was before the court at the same time and that the Air Force presented extra-pleading materials in opposing that motion. *See* brief for appellees at 5 n. 3. The Air Force apparently contends, however, that the Dis-

---

1. Although there are numerous additional factual assertions and assumptions appearing both in the record and in the briefs, we restrict our

statement of the underlying facts of the case to facts alleged in TCI's complaint that do not appear to be disputed by the parties.

trict Court did in fact, in its review of the motion to dismiss, take all the facts alleged in TCI's complaint as true. *See id.* at 5. Based on this interpretation of the District Court's decision, the Air Force disagrees with TCI's contention that reversal is mandated. The Air Force also contends in the alternative that if the District Court did consider materials outside of TCI's complaint, the District Court's decision should be affirmed as a summary judgment. *See id.* at 5 n. 3.

We conclude that, in the circumstances of this case, the dismissal cannot properly be treated as a summary judgment, even if materials outside of TCI's complaint were considered by the District Court. We also conclude, however, that although consideration of external materials is improper under a Rule 12(b)(6) motion to dismiss, reversal based on such consideration alone would serve no useful purpose. Where such consideration has occurred, rather, normal 12(b)(6) review will be in order.

A.  *Potential for Reviewing the District Court Decision as a Summary Judgment*

The normal course of action when materials outside the complaint are considered is for a nominal motion to dismiss to be treated as a motion for summary judgment. As Rule 12(b) states, "If, on a [Rule 12(b)(6) motion], matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *See also Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972) (*per curiam* ); *Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.,* 595 F.2d 711, 719 n. 41 (D.C.Cir.1978); *Scanwell Laboratories, Inc. v. Thomas,* 521 F.2d 941, 949 (D.C.Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976).

There are constraints on a court's ability to thus transform a motion to dismiss, however. Specifically, Rule 12(b) provides further that, if a motion to dismiss is converted to a motion for summary judgment, "all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." *See also Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 360 (D.C.Cir.1982). Under Rule 56 such materials include affidavits and documentary evidence that would show that a genuine issue of material fact existed. Rule 56 contains a similar but more explicit constraint: "The motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing [on the motion]." Rule 56(c).

■  Thus a reviewing court should not automatically treat a dismissal where external materials were not excluded as a summary judgment, although such treatment may be the most common result of such a situation. Rather, the reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed.

■  Here, treatment of the dismissal as a summary judgment would not be appropriate. The motion was served on TCI on December 23, 1983, and argument was heard on December 27, 1983—a mere four days later. This scheduling complies with neither the explicit 10-day requirement of Rule 56(c) nor the reasonable-period-for-response requirement of Rule 12(b). (The four-day period, as TCI notes in its brief, spanned a weekend and included Christmas and Christmas Eve.) Consequently, the motion cannot properly be recast as a motion for summary judgment, and the District Court's decision must stand or fall as a pure Rule 12(b)(6) dismissal.

B.  *Review of the District Court Decision as a Dismissal under Rule 12(b)(6)*

■  As recently reaffirmed by this court, "Dismissal for failure to state a claim for relief is proper only when 'it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.' All factual doubts must be resolved and all inferences made in favor of the

plaintiff[ ]." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1506 (D.C.Cir. 1984) *(en banc )* *(quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (emphasis added by the *Ramirez* court; footnotes omitted)). Further, as implied by the summary judgment discussion above, a Rule 12(b)(6) disposition must be made on the face of the complaint alone.

■ Consideration of external materials, which would normally initiate conversion of the motion to one for summary judgment, cannot properly take place under a dismissal for failure to state a claim. This limitation cannot be avoided simply because the party against whom the dismissal was granted desired an expeditious disposition of a concurrent motion for a preliminary injunction. Such reasoning would allow circumvention of the Rule 12/Rule 56 constraints whenever a claim was joined with a request for preliminary relief. This is not a result allowable under the Federal Rules.

■ As noted above, TCI contends that any action by the District Court that was inconsistent with the Rule 12 requirements makes that court's dismissal automatically reversible. Thus TCI apparently would have us reverse and remand if the District Court failed to take the facts as alleged in TCI's complaint and considered materials outside of its pleading. We do not believe that this course would serve the interests of justice or of judicial economy. Although it is clearly improper for a District Court to fail to comply with the technical and substantive requirements of the applicable federal rules, we do not see what purpose would be served by remanding a case to the District Court for a purely legal determination that we are fully competent to make ourselves. We note that this is proper only where no factual determinations need be made, that is, where the question is entirely one of law. Such is the case with a motion to dismiss for failure to state a claim. Consequently, where we determine that the District Court has improperly failed to follow the strictures of Rule 12, we will determine whether the dismissal was appropriate in any case under Rule 12 as properly applied rather than remand for such a determination in the District Court.

■ In reality, therefore, our review in a case in which the District Court improperly considered materials outside of the complaint is similar to normal review of Rule 12(b)(6) dismissals: For this court to affirm such a dismissal, it must be self-evident from the face of the complaint, resolving all doubts and drawing all inferences in favor of the plaintiff, that the plaintiff is not entitled to any relief. Our review will differ only in that we must be especially careful to scrupulously avoid making factual assumptions which appear reasonable or even obvious from the record but which cannot properly be drawn from the plaintiff's complaint. With this in mind, we turn to the specific claims raised by TCI and dismissed by the District Court.

### III. REVIEW OF THE DISMISSAL OF TCI's CLAIMS

### A. *First Amendment Claim*

In its complaint TCI alleged that "defendants have dedicated certain rights-of-way, poles, support structures and land for use in the provision of cable television services and programming to the servicemen and their families residing at Homestead Air Force Base. Those facilities are essential to the conduct of a cable television enterprise at Homestead Air Force Base." Complaint, *supra*, ¶ 8, App. B. TCI further alleged that it was in the business of providing cable television service and that the defendants, through a solicitation process, had determined that TCI could no longer operate on the base, that is, use the facilities essential to operating on the base. *See id.* at ¶¶ 2, 13–14, 17–19. TCI also alleged that "[t]here are no legal or practical reasons why two companies cannot compete directly to provide cable television services to customers at Homestead Air Force Base." *Id.* at ¶ 20. Finally, TCI alleged that, given these facts, the Air Force's planned exclusion of TCI from the base violated TCI's First Amendment right

to disseminate *"inter alia,* news, entertainment and information to residents of Homestead Air Force Base * * *." *Id.* at ¶ 23.

In comparison with TCI's factual allegations, the District Court, in its memorandum opinion accompanying its dismissal of TCI's claim, noted that "[p]laintiff seeks access to a military installation dedicated to military use." 580 F.Supp. at 14. The District Court also stated that "granting access to multiple cable television companies would involve significant burdens on the military installation and its mission, and would negate legitimate advantages the Air Force enjoys as a result of limiting access to a single such cable television firm." *Id.* (The District Court noted in a footnote that it was obliged to consider the effects of multiple cable companies rather than two because eight companies had bid for the contract. *Id.* n. 2.) The District Court went on to explicate precisely what those advantages enjoyed by the Air Force were: "In the Air Force's view, permitting multiple cable operators onto the base rather than soliciting competitive bids for the rights to an exclusive franchise would also raise costs to individual subscribers, thus implicating the military's interest in the morale of those in its service. It is apparent, then, that the government's restriction on access to the base is grounded on legitimate and rational military objectives." *Id.* Using these factual assumptions, the District Court concluded that, although TCI does "enjoy[ ] the protections of the First Amendment," *id.* at 13, "[i]nasmuch as the challenged denial of access involves a forum traditionally not open to public communication, rationally furthers a legitimate government interest, and is content neutral, it does not violate plaintiff's First Amendment rights." *Id.* at 15.

The facts relied upon by the District Court in reaching this conclusion, however, appear nowhere in TCI's complaint. In fact, they are exactly the opposite factual assumptions from those a court would make if it, as required, took the assertions in the complaint as given and then resolved all factual doubts and inferences in favor of the pleader. TCI alleged that the rights-of-way necessary to conduct cable television services had been dedicated to such use; the District Court found that the entire military installation was dedicated to military use (presumably with no exceptions). TCI alleged that no legal or practical burdens would accrue from two cable television companies competing and in no way indicated that more than two companies might end up competing; the District Court assumed that eight companies might compete and that this would constitute a significant burden. Thus the District Court's factual assumptions cannot serve as the basis for an affirmable Rule 12(b)(6) dismissal of TCI's First Amendment claim.

Thus we must consider whether, applying the correct standard and using TCI's factual allegations only, TCI's complaint did in fact state a First Amendment claim. First, we must decide the question whether TCI's enterprise is protected by the First Amendment at all. If it is, we must then consider whether TCI has stated a valid First Amendment claim, taking as true the factual allegations in its complaint and applying the applicable law.

■ The District Court found that, under this court's decision in *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 43–51 (D.C. Cir.) *(per curiam), cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), TCI's activity of providing cable television service was entitled to some First Amendment protection. *See* 580 F.Supp. at 13. With this step of the District Court's analysis, we agree entirely. *See also Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396, 1404 (9th Cir.1985); *Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 127 (7th Cir.1982); *Community Communications Co. v. City of Boulder,* 660 F.2d 1370, 1376 (10th Cir. 1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Midwest Video Corp. v. FCC,* 571 F.2d 1025, 1054 & n. 70 (8th Cir.1978), *aff'd on other grounds,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). Whether or not TCI

produces any original programming of its own, its activities of transmitting and packaging programming mandate that it receive First Amendment protection. *See Omega Satellite Products, supra,* 694 F.2d at 127; *Weaver v. Jordan,* 64 Cal.2d 235, 49 Cal. Rptr. 537, 411 P.2d 289, *cert. denied,* 385 U.S. 844, 87 S.Ct. 49, 17 L.Ed.2d 75 (1966); *cf. Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (applying First Amendment to sale and distribution of publications). Thus we turn to the subsequent question whether TCI has adequately alleged that its First Amendment rights were violated *in the instant situation.*

The next step, therefore, is to determine whether, under the applicable First Amendment law, the particular factual allegations made by TCI state a viable claim. This determination self-evidently depends upon the contours of the applicable First Amendment law. Unfortunately, describing the contours of that law is difficult because of a lack of direct precedent on the question.

As noted by the parties, however, there is a substantial body of Supreme Court case law that confronts the general problem of allowing access to government-owned property for the purpose of exercising First Amendment rights; this is the body of cases that comprise the public forum doctrine jurisprudence. The public forum doctrine, as described by these cases, defines situations in which the government cannot close government-owned property to parties who desire to use that property as a forum for exercising their First Amendment rights. Specifically, these cases appear to provide for three categories of government-owned property—two types of public forums and one "nonforum" category. *See generally Perry Education Ass'n*

*v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–956, 74 L.Ed.2d 794 (1983) (summarizing the three categories discussed below).

First, property that historically has been both open to the public and available to anyone for use as a forum for the exercise of the First Amendment right of free speech constitutes an unconditional public forum. Such forums include facilities like streets and parks. *See, e.g., United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (public sidewalks). Second, property that has not been traditionally open for speech but that has been opened by the government as a forum for speech, often for a particular type of speech, also constitutes a public forum. Such property as municipal theaters, *see Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), and school classrooms that are held open for student use, *see Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), falls into this second category of public forums. *See also Lebron v. WMATA,* 749 F.2d 893 (D.C.Cir. 1984) (subway display space). In contrast, property that has been neither historically open to the public nor specifically opened by the government for use as a forum for speech does *not* constitute a public forum. Property such as military bases with restricted access, *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976),[2] and intra-school mailboxes, *see Perry, supra,* has been held to fall into this third "nonforum" category.

The designation of property as a public forum or as a "nonforum" carries with it substantive effects regarding the extent and type of restrictions that the govern-

---

**2.** *Greer v. Spock,* it should be noted, did not hold that *any* military base falls automatically into the "nonforum" category. Rather, *Greer* held simply that, based on the facts *in that case,* which established that the base there had not been opened generally by the military to the public for expressive or other purposes, the base commander could constitutionally place certain content-neutral restrictions on speech on the base. *See Greer,* 424 U.S. at 837–838, 96 S.Ct. at

1217–1218 (distinguishing *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (*per curiam* ) (holding that civilian distributing leaflets on military base could not constitutionally be convicted of unlawfully entering the base where the military had "abandoned any right to exclude civilian vehicular and pedestrian traffic from the avenue," *Greer,* 424 U.S. at 835, 96 S.Ct. at 1216).

ment may place upon the speech by the general public that may occur there. Government restrictions on speech in public forums of either the first or second type are subject to strict requirements. In public forums the government may restrict speech only (1) by enforcing time, place, and manner restrictions *if* those restrictions are content-neutral and narrowly tailored to serve a significant government interest, or (2) by imposing content-based exclusions *if* the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. *See Perry, supra,* 460 U.S. at 45–46, 103 S.Ct. at 954–956. With respect to nonforums, however, the government may "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46, 103 S.Ct. at 955; *see also U.S. Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981).

■ Applying this public forum jurisprudence to the factual allegations in TCI's complaint, we find that TCI has adequately alleged a First Amendment cause of action. TCI alleged in its complaint that there were *no* reasons, practical or legal, why two cable television companies could not simultaneously use the cable rights-of-way on Homestead Air Force Base. This allegation, if taken as true, would mean that TCI's First Amendment rights had been infringed if the right-of-way was a public forum of either kind *or* if it was a nonforum: If the property is a public forum, the government may restrict speech only to serve significant (if content-neutral) or compelling (if not content-neutral) interests; if the property is a nonforum, the government may restrict speech only if such restriction is reasonable. An allega-

tion that there were no reasons for restricting speech thus states a claim under either analysis. (It does appear, however, that TCI also adequately alleged that the right-of-way was a public forum by its allegation that the Air Force had dedicated the right-of-way for cable television use.) Thus we hold that TCI did state a First Amendment claim upon which relief could be granted. Consequently, we reverse and remand to the District Court.

Because of the relative novelty of TCI's claim, we add an observation on the effect of our holding. We note first that two of the three circuits that have previously considered the issue of cable television's right of access to government-owned property for the purpose of communicating to viewers have not used the public forum doctrine in their analysis. These two circuits, rather, seemed instead simply to balance the competing interests involved. *See Community Communications, supra,* 660 F.2d at 1375–1380 (balancing the competing interests of the cable television company's desire to communicate and the municipality's need to preserve certain public resources that might be burdened by the provision of cable television service); *see also Omega Satellite Products, supra,* 694 F.2d at 127–128 (balancing interests of cable company with burden on public resources and assumed fact that cable television represents a natural monopoly). The third circuit to address this issue did note the potential relevance of the public forum doctrine but did not hold that the public forum doctrine governed without alteration in this context; it seemed to use the doctrine merely as additional support for a conclusion already reached on other grounds. *See Preferred Communications, Inc., supra,* 754 F.2d at 1407–1409.[3]

We note also that the Supreme Court has often stated that "[e]ach medium of expression * * * must be assessed for First Amendment purposes by standards suited to it, for each may present its own prob-

---

**3.** The precise basis for the Ninth Circuit's opinion is unclear, but it seems to consist of a rejection of certain proffered reasons for allowing exclusive cable franchising (similarity of cable television to wireless broadcasting, assert-

ed natural monopoly characteristic of cable television, and disruption by cable television of public resources), aided by collateral support from the public forum doctrine.

lems." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975). *See also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (plurality opinion); *FCC v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). Thus, although historical First Amendment jurisprudence signals the analytic approach to be used in determining the First Amendment protection due a new medium, a court describing that protection must be careful to adapt that jurisprudence to the new context.

In light of these observations, we wish to make clear that our holding that TCI has stated a First Amendment claim under public forum jurisprudence is not a holding that a different and perhaps more appropriate First Amendment analysis may not properly be developed during the proceedings on remand.[4]

### B. *Fifth Amendment Claim*

The same allegations in TCI's complaint that preclude a Rule 12(b)(6) dismissal of its First Amendment claim also preclude such a dismissal of its Fifth Amendment claim. As noted above, the District Court found that the Air Force had legitimate government interests in denying access to TCI. The District Court went on to note that "[n]o due process violation has occurred since plaintiff's First Amendment rights have not been infringed and there is no dispute over the conduct of the bid process itself." 580 F.Supp. at 15. Having determined that TCI's complaint did in fact state a First Amendment claim, we must now reexamine the dismissal of the Fifth Amendment claim as well, bearing in mind that none of the District Court's subsidiary factual conclusions can be adopted unless they are clearly alleged in the complaint.

From the complaint we glean three factual assumptions that must be made in this Rule 12(b)(6) determination: First, that the Air Force had dedicated the necessary property to cable television transmission; second, that TCI had been denied access to this property; and third, that there were no reasons for not allowing two cable companies to use that property. *See* Complaint, *supra*, at ¶¶ 8, 17–18, 20. Using these

---

4. A different First Amendment analysis might be indicated, for example, because of inconsistencies between the factual assumptions underlying the public forum analysis and the facts in the situation at issue.

Specifically, the public forum doctrine is focused on messages rather than on media, and it assumes that speech which is excluded from government-owned property by virtue of a determination that that property is not a public forum can be effectively, if not *as* effectively, communicated elsewhere. *See, e.g., Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, — U.S. —, —, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984) (noting that "restriction on expressive activity may be invalid if the remaining modes of communication are inadequate"); *see also Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 53, 103 S.Ct. 948, 959, 74 L.Ed.2d 794 (1983); *U.S. Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 127, 101 S.Ct. 2676, 2684, 69 L.Ed.2d 517 (1981); *Greer v. Spock, supra* note 2, 424 U.S. at 839, 96 S.Ct. at 1218. The instant situation, however, differs in that it focuses on a particular medium and in that that medium often *requires* use of the government-owned property in order to communicate. For

example, cable companies ordinarily must string their cables from utility poles (as in this case) or lay the cable underground—usually under streets or other property owned by the government.

Further, the public forum analysis also implicitly contemplates that the effective alternative channels of communication that do exist will not significantly burden public resources. (Otherwise, the public forum analysis would not resolve the problem; it would merely focus the conflict on another resource-burdening mode of communication.) Yet communication via cable television may, because it may require use of government-owned property, in some cases not be possible at all without significantly burdening that property. For example, although adding an additional cable to utility poles may constitute an insignificant burden in most cases, tearing up a street to lay an underground cable may well create a significant problem. *See Omega Satellite Products v. City of Indianapolis*, 694 F.2d 119, 127 (7th Cir.1982); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370, 1377–1378 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

factual allegations, we now apply Fifth Amendment law to determine whether a claim was stated by TCI.

■■■■ The Due Process Clause of the Fifth Amendment has been held to include an equal protection provision. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Under equal protection doctrine, differential treatment of parties is constitutional only if adequately related to a sufficient governmental interest. Ordinarily, the test is that it must be rationally related to a legitimate state interest. Where the differential treatment burdens the exercise of a fundamental right such as the First Amendment's freedom of speech, however, equal protection demands more. *See, e.g., Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) ("discriminations among pickets must be tailored to serve a substantial governmental interest"); *see also Dunn v. Blumstein,* 405 U.S. 330, 342–343, 92 S.Ct. 995, 1003–1004, 31 L.Ed.2d 274 (1972).

■■■■ As noted above, TCI's complaint clearly states that there are no legal or practical reasons why two cable television companies cannot compete directly to service Homestead Air Force Base. This allegation suffices to withstand a motion to dismiss for failure to state a claim, whether or not TCI's First Amendment rights may have been infringed. For even if TCI's First Amendment rights have not been burdened, the restriction on TCI may violate the equal protection requirement if it is not rationally related to a legitimate governmental interest. *See Perry, supra,* 460

U.S. at 54, 103 S.Ct. at 959. TCI's allegation states that the government has no reasons, legitimate or compelling, for excluding one television station and not another. Consequently, although the ultimate merit of such a claim may be extremely doubtful unless TCI's First Amendment rights have in fact been burdened, dismissal is not appropriate. The complaint states a claim and, regardless of the likelihood of success, if the complaint states a claim it must withstand the Rule 12(b)(6) motion to dismiss. Thus the District Court's dismissal of TCI's Fifth Amendment claim was incorrect and must be reversed.

■■■■ TCI's brief also presents an argument that centers around the statutory easement provision which authorizes the type of easement at issue here to be granted by the Air Force. *See* 16 U.S.C. § 420 (1982); 43 U.S.C. § 961 (1982).[5] Although the content of this argument is not entirely clear, it appears to break down into one purely statutory claim—that the Air Force, by granting an easement to one party, granted an easement to any party desiring one—and one statutorily-rooted constitutional claim—that this statute created a property right in TCI that was then unconstitutionally taken by the Air Force. Although these arguments were not specifically raised in TCI's complaint (the complaint contains no reference to the statutory provisions in question or to any easement as such), the District Court, apparently responding to TCI's raising of it in a brief filed after its complaint, made specific findings on the issues. The District Court

---

5. 16 U.S.C. § 420 (1982) provides, in pertinent part:

   The head of the department having jurisdiction over the lands is authorized and empowered, under general regulations to be fixed by him, to grant an easement for rights-of-way, for a period not exceeding fifty years from the date of the issuance of such grant, over, across, and upon the public lands and reservations of the United States for electrical poles and lines for the transmission and distribution of electrical power, and for poles and lines for communication purposes, and for radio, television, and other forms of communication transmitting, re-

lay, and receiving structures and facilities, to the extent of two hundred feet on each side of the center line of such lines and poles and not to exceed four hundred feet by four hundred feet for radio, television, and other forms of communication transmitting, relay, and receiving structures and facilities, to any citizen, association, or corporation of the United States, where it is intended by such to exercise the right-of-way herein granted for any one or more of the purposes herein named[.] * * *

43 U.S.C. § 961 (1982) contains an almost identical provision.

found that (1) the statute did not automatically provide that, where an easement is granted to one party for a particular purpose, any other party is also automatically entitled to an easement for that purpose, and (2) TCI's easement, effective until 11:59 P.M. on December 31, 1983, expired automatically at that time so that TCI had no continuing property interest that might be unlawfully abrogated by the Air Force. *See* 580 F.Supp. at 15.

With respect to the first finding, we believe the District Court correctly decided the issue. (Consequently, we need not decide whether the complaint adequately alleged it.) The statute here specifically states that the governmental body with jurisdiction over the lands in question "is authorized and empowered * * * to grant an easement for rights-of-way * * * to any citizen, association, or corporation of the United States * * *." The plain language of this statute indicates that the government body can grant the easement to one party if it wishes. It does not follow that once an easement is granted any party may use that easement.[6]

■ The District Court's handling of the second question is more troublesome. The District Court found that, as the Air Force alleged, the easement given to TCI simply expired at the end of 1983. This, however, is a factual assumption which was not alleged in the complaint. What TCI alleged in its complaint was that the Air Force had dedicated certain property to transmission of cable television and that TCI was not being allowed to use that property. The question, therefore, is whether this allegation stated a claim beyond those discussed above. We conclude that it did not. As the District Court noted, no allegations of improper bid procedures appeared in the complaint. Thus no procedural due process claim was stated. Further, no allegation appeared that TCI

had a property interest in the right-of-way. Consequently, no takings claim was stated. Therefore, we find only that TCI has stated an equal protection Fifth Amendment claim.

## C. *Sherman Antitrust Act Claim*

■ TCI, in its complaint, also alleged that the government, acting as a common agent for the service people stationed at Homestead Air Force Base, acted in such a way as to establish a monopoly in service of cable television to the base. *See* Complaint, *supra*, at ¶ 42. TCI further alleged, however, that access was also allowed for the purpose of "furnishing * * * cable television services to Air Force facilities at Homestead Air Force Base including but not limited to the hospital and to various duty rooms, day rooms, and recreational areas." *Id.* at ¶ 13.

In its brief, TCI admits that United States governmental entities generally are exempt from the antitrust laws, but argues that this case should be distinguished because the Air Force was acting as a representative for the individual service people on the base. This argument, however, is not sufficient to build this into a viable claim, even if our holding in *Sea-Land Service, Inc. v. Alaska Railroad*, 659 F.2d 243, 244 (D.C.Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982) ("Congress did not place the United States or its instrumentalities under the governance of the Sherman Act"), would allow such a result. TCI itself stated in its complaint that the Air Force was also acting to ensure service to common areas. Thus it was not acting solely as a representative for the individuals on the base. In sum, the District Court was correct in dismissing TCI's antitrust claim, and we affirm it on that point.

---

**6.** The legislative history cited by TCI, *see* brief for appellant at 27, does not require a different conclusion. That legislative history merely distinguishes the situation prior to enactment of the statute, where permits to use rights-of-way were granted but often conditioned on the payment of annual fees, from the situation envisioned by the statute, where, once a right-of-way was granted to a party by the granting of an easement, that right-of-way could not be unilaterally revoked by the government or conditioned on the payment of additional fees.

### IV. CONCLUSION

The District Court's dismissal of TCI's First and Fifth Amendment claims is reversed and remanded. The dismissal of TCI's antitrust claim, however, is affirmed. For clarity's sake, we note additionally that the reversal with respect to the First and Fifth Amendment claims applies only to the District Court's dismissal of these claims under Rule 12(b)(6): Although the District Court decision at issue here was not appropriate as a summary judgment, our decision does not preclude the possibility of summary judgment on remand.

*So ordered.*