Richard COLEMAN, et al., Plaintiffs,

v.

The PENSION BENEFIT GUARANTY
CORPORATION, Defendant.

No. 99–278 SSH.

United States District Court,
District of Columbia.

March 21, 2000.

Susan S. Sauntry, Washington, DC, for plaintiffs.

Jeffrey Bruce Cohen, Nancy Snyder Heermans, Pension Benefit Guaranty Corp., Office of the General Counsel, Washington, DC, for defendant.

## *OPINION*

STANLEY S. HARRIS, District Judge.

Before the Court are defendant's motion to dismiss, plaintiffs' opposition thereto, defendant's reply, and plaintiffs' surreply. Upon consideration of the entire record, the Court denies defendant's motion. Although findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56, *see* Fed.R.Civ.P. 52(a); *Summers v. Department of Justice*, 140 F.3d 1077, 1079–80 (D.C.Cir.1998), the Court nonetheless sets forth its reasoning.

## *BACKGROUND*

Plaintiffs are former employees of McLouth Steel Products Corporation ("McLouth Products") who claim benefits under a pension plan, the "Products Plan," previously administered by McLouth Products. All of the plaintiffs were laid off by McLouth Products in March 1996, after it closed its production plants; the Products Plan was terminated effective August 11, 1996. Defendant Pension Benefit Guaranty Corporation ("PBGC") is a federal agen-cy that administers the pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1301–1461. When a covered pension plan terminates with insufficient assets to satisfy pension obligations, PBGC becomes the trustee of the plan and guarantees payment of certain pension benefits to plan participants. *See generally Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 636–640, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). PBGC became trustee of the Products Plan upon the plan's termination.

The background to this litigation spans almost twenty years. McLouth Products's predecessor, McLouth Steel Corporation ("MSC"), administered the McLouth Pension Plan for Union Employees (the "Hourly Plan"). In 1981, MSC filed for bankruptcy. Approximately one year later, McLouth Products purchased substantially all of MSC's assets out of bankruptcy. As part of that transaction, MSC transferred certain assets and liabilities of the Hourly Plan to McLouth Products's newly-created Products Plan. MSC then filed an application with PBGC to terminate the Hourly Plan. Thereafter, PBGC became statutory trustee of the Hourly Plan.

PBGC objected to the spin-off of assets and liabilities from the Hourly Plan to the Products Plan. After several years of negotiations among PBGC, McLouth Products, and the United Steelworkers of America (the "Union") about the spin-off and proposed termination of the Hourly Plan, the parties reached an agreement (the "Settlement Agreement") in 1988. In that agreement, McLouth Products agreed to "spin-back" certain assets and liabilities from the Products Plan to the Hourly Plan, and to grant PBGC a lien on its assets in order to secure certain minimum funding obligations of the Products Plan, which had been waived. *See* Def.'s Motion, Ex. 2, ¶¶ 5.1–5.3, 6. The Settlement Agreement also provided that, if the amount of assets and liabilities spun back

to the Hourly Plan needed to be changed as a result of guidance that McLouth Products was seeking from the Internal Revenue Service (the "IRS"), the parties would adjust the amounts accordingly. *Id.* ¶ 5.3. Under the terms of the Settlement Agreement, the reconstituted Hourly Plan was terminated effective November 30, 1982. *Id.* ¶ 1.1.

On September 29, 1995, McLouth Products filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Shortly thereafter, McLouth Products, PBGC, and the Union agreed to amend the Products Plan to suspend the provision of Layoff Pension Benefits ("LPBs"), which allowed plan participants meeting a combination of age and service requirements to take early retirement with enhanced benefits in the event of a layoff. *See* Compl. ¶¶ 26, 34. Under the terms of the Products Plan, such an amendment required the consent of the Union. Plaintiffs allege that McLouth Products and PBGC obtained the Union's consent to this amendment by failing to advise the Union and company employees of the imminent termination of the Products Plan; according to plaintiffs, they were led to believe that, if the plan were amended in the manner described, it would not be terminated and the plants would not be closed. *See id.* ¶¶ 36–38. On October 27, 1995, McLouth Products amended the Products Plan by suspending LPBs for the duration of its period in bankruptcy.

On February 2, 1996, McLouth Products, PBGC, and the Union entered into a Memorandum of Understanding ("MOU"), in which they agreed, in relevant part, that: (1) McLouth Products would transfer $12.68 million of assets from the Products Plan to PBGC, as statutory trustee of the Hourly Plan, in order to complete the spin-back of assets provided for in the Settle-

ment Agreement[1]; (2) PBGC would not commence proceedings to terminate the Products Plan until (a) a permanent shutdown of a McLouth Products plant occurred, (b) McLouth Products's Chapter 11 proceedings were converted to Chapter 7 liquidation proceedings, or (c) substantially all of McLouth Products's assets were sold; and (3) in the event of termination, the Products Plan's effective termination date would be one day before the triggering event. Def's Motion, Ex. 3, ¶¶ 1–3. Plaintiffs allege that the $12.68 million asset transfer was only made possible by the amendment to the Products Plan suspending the plan's obligation to pay LPBs, and that McLouth Products received significant tax credits or waivers and secured the removal of PBGC's liens on its assets as a *quid pro quo* for the asset transfer.[2] *See* Pls.' Opp'n at 3. McLouth Products effected the $12.68 million asset transfer on February 5, 1996.

In March 1996, McLouth Products closed its production plants and laid off its non-managerial workforce. On August 12, 1996, the Bankruptcy Court approved an agreement in which McLouth Products sold substantially all of its assets. In accordance with the terms of the MOU, PBGC terminated the Products Plan as of August 11, 1996, and thereafter became its trustee. At some point in the fall of 1996, a meeting was held for Products Plan participants at which a PBGC representative was present. Plaintiffs allege that the representative advised the participants that they could not claim LPBs because the LPBs had been eliminated in order to protect existing retirees under the plan. *See* Pls.' Opp'n, Exs. B, C, D & E.

Plaintiffs filed the instant lawsuit as a class action on behalf of all participants in the Products Plan who were laid off by McLouth Products after October 27, 1995,

---

1. PBGC refers to the amount of the asset transfer as $12.6 million, while plaintiffs refer to it as $12.7 million. The MOU states that the amount of the transfer was $12,680,-293.00. Rounding to the nearest ten-thousand, the Court uses the figure $12.68 million to describe the amount of the transfer.

2. The MOU does not contain any provision pertaining to the grant of tax credits or removal of liens. Plaintiffs allege that "[t]he parties failed to document [these] key elements in their agreement." Pls.' Opp'n at 5 n. 5.

and who were eligible to claim LPBs. *See* Compl. ¶ 48. Plaintiffs' complaint alleges two ERISA violations. Count I alleges that the plan amendment suspending LPBs is invalid because it contravened 29 U.S.C. § 1054(g)(1), which states that an "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." In the alternative, Count I alleges that the amendment is invalid because the Union's consent was obtained through misrepresentation. Count II alleges that the transfer of $12.68 million in Products Plan assets to PBGC was a prohibited transaction in violation of 29 U.S.C. § 1106 because it benefitted McLouth Products.[3] Plaintiffs request that the Court declare the amendment to the Products Plan invalid, require PBGC to pay LPBs to all class members, and require PBGC to repay the Products Plan $12.68 million. In the motion pending before the Court, PBGC argues that Count I should be dismissed because plaintiffs have not exhausted their available administrative remedies, and that Count II should be dismissed because it fails to state a claim upon which relief can be granted.

## STANDARD OF REVIEW

■ A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure should not be granted "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief."[4] *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *accord Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint is construed liberally in plaintiffs' favor, and plaintiffs are given the benefit of all inferences that can be derived from the facts alleged. *See*

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C.Cir.1997); *Tele–Communications of Key West, Inc. v. United States*, 757 F.2d 1330, 1334–35 (D.C.Cir.1985). "However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal*, 16 F.3d at 1276.

In the event matters outside the pleadings are presented to and not excluded by the Court, and the Court assures itself that such treatment would be fair to both parties, a motion to dismiss under Rule 12(b)(6) may be treated as one for summary judgment and disposed of as provided in Federal Rule of Civil Procedure 56. Fed.R.Civ.P. 12(b); *Americable Int'l Inc. v. Department of the Navy*, 129 F.3d 1271, 1274 n. 5 (D.C.Cir.1997); *Tele–Communications*, 757 F.2d at 1334. Because the Court will consider various matters outside the pleadings raised by both parties in connection with their briefing of the instant motion, it treats PBGC's motion to dismiss as one for summary judgment. Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere allegations in the pleadings, however, are not sufficient to defeat a summary judgment motion; if the moving

---

**3.** For further elaboration of this claim, *see infra* Discussion, Part B.

**4.** PBGC moves to dismiss Count II of plaintiffs' complaint under Rule 12(b)(6). Nevertheless, PBGC does not specify under which subsection of Rule 12(b) it moves to dismiss Count I. Because exhaustion of internal remedies under ERISA is not a prerequisite to a court's exercise of jurisdiction, but rather a

matter of judicial discretion, *see McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), and because "Rule 12(b)(6) forms a proper basis for dismissal for failure to exhaust administrative remedies," *Taylor v. United States Treasury Dep't*, 127 F.3d 470, 478 n. 8 (5th Cir.1997), the Court treats PBGC's motion to dismiss Count I as one under Rule 12(b)(6).

party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

### A. *Count I—Failure To Exhaust*

PBGC argues that plaintiffs have failed to exhaust their administrative remedies by not availing themselves of the required procedures for challenging benefit determinations. Under PBGC regulations, once PBGC becomes statutory trustee of a terminated pension plan, it makes an initial benefits determination as to each plan participant, sending them an initial determination letter ("IDL"). *See* 29 C.F.R. §§ 4003.1(a), (b)(6) and (7), 4003.21. A participant who wants to challenge the IDL must file an appeal with the PBGC Appeals Board. *Id.* § 4003.7. The subsequent decision of the Appeals Board constitutes final agency action, at which point the participant may seek judicial review. *Id.* § 4003.59(b). PBGC argues that, because plaintiffs have not presented their claim for LPBs to the Appeals Board, they have failed to exhaust their administrative remedies. Plaintiffs do not dispute their failure to exhaust, but rather contend that it would be futile to pursue their claim within the agency. Alternatively, plaintiffs contend that the exhaustion requirement does not apply to their claim because it asserts a statutory ERISA violation, as opposed to a violation of the terms of their pension plan.

 At the outset, the Court notes that plaintiffs seeking a determination pursuant to ERISA of their rights under a pension plan must generally exhaust the administrative remedies available under their plan. *See Communications Workers of America v. American Tel. & Tel. Co.,* 40 F.3d 426, 431 (D.C.Cir.1994) (quoting *Springer v. Wal–Mart Assocs. Group Health Plan,* 908 F.2d 897, 899 (11th Cir. 1990)). Nevertheless, when a plaintiff alleges a statutory violation of ERISA, the courts are divided over whether the exhaustion requirement applies. *Compare Powell v. A.T. & T. Communications, Inc.,* 938 F.2d 823, 825–26 (7th Cir.1991) (exhaustion requirement applies); *Simmons v. Willcox,* 911 F.2d 1077, 1081 (5th Cir. 1990) (same); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 846 (11th Cir.1990) (same), *with Zipf v. American Tel. & Tel. Co.,* 799 F.2d 889, 891 (3d Cir.1986) (exhaustion requirement does not apply); *Amaro v. Continental Can Co.,* 724 F.2d 747, 752 (9th Cir.1984) (same). Although the Court of Appeals for the D.C. Circuit has not decided this issue, at least three district judges in this Circuit have concluded that exhaustion is not required before a court may rule on an asserted violation of ERISA's statutory protections. *See Greer v. Graphic Communications Int'l Union Officers,* 941 F.Supp. 1, 3 (D.D.C.1996); *Garvin v. American Ass'n of Retired Persons,* 1992 WL 693382, *3–4 (D.D.C.1992); *Rauh v. Coyne,* 744 F.Supp. 1186, 1191–92 (D.D.C. 1990). In the absence of controlling precedent, the Court is persuaded by the Third Circuit's finding in *Zipf* that there is "no indication in [ERISA] or its legislative history that Congress intended to condition a plaintiff's ability to redress a statutory violation in federal court upon the exhaustion of internal remedies. The provision relating to internal claims and appeals procedures, Section 503, refers only to procedures regarding claims for benefits."[5]

---

**5.** PBGC attempts to distinguish those cases holding that the exhaustion requirement does not apply to claims of statutory violations on the ground that they involve private arbitration procedures, whereas this case involves public administrative procedures because PBGC is administering the Products Plan as statutory trustee. Thus, PBGC argues, its involvement in this case implicates "[w]ell-established principles of administrative law dictat[ing] that the court allow the agency to interpret the law before they determine whether the agency has violated it." Def.'s Reply at 3 (quoting *Action for Children's Tele-*

*Zipf,* 799 F.2d at 891. Thus, the Court concludes that the exhaustion requirement does not apply to claims asserting statutory violations. Because Count I of plaintiffs' complaint alleges that the amendment to the Products Plan suspending LPBs violated 29 U.S.C. § 1054(g), plaintiffs were not required to exhaust available administrative remedies before bringing their claim in federal court.[6]

▮ Furthermore, even if the exhaustion requirement did apply, plaintiffs' failure to exhaust their administrative remedies would be excused on the ground of futility. Futility is a recognized exception to the exhaustion requirement. *See Communications Workers,* 40 F.3d at 432. Nevertheless, it is a narrow one, and requires that there be a "certainty of an adverse decision," or some other indication that resort to the administrative process would be "clearly useless." *Id.* (internal quotations omitted). That requirement is met here. First, PBGC's position as to plaintiffs' entitlement to LPBs was well-established; not only did PBGC participate in drafting the amendment to the Products Plan which terminated the availability of LPBs, but a PBGC representatives advised plan participants, at a meeting in 1996, that they could not claim LPBs. *See* Pls.' Opp'n, Exs. B, C, D & E. And, although PBGC argues that the Appeals Board ultimately could decide that plaintiffs are entitled to LPBs, the fact remains that LPBs no longer exist because they have been amended out of the plan. In this vein, the crux of plaintiffs' claim does not concern eligibility for LPBs under the terms of the Products Plan, but rather challenges the legality of the amendment. *See Costantino v. TRW, Inc.,* 13 F.3d 969, 974–75 (6th Cir.1994) (resort to administrative process futile because plaintiffs' claim directed at legality, rather than interpretation, of plan amendment). Under these circumstances, the Court finds that plaintiffs' resort to PBGC review procedures would have been clearly useless.[7] Accordingly, any obligation of plaintiffs to exhaust their administrative remedies is excused on the ground of futility.

Because the Court concludes that the exhaustion requirement does not apply to ERISA claims alleging statutory violations and, if it did, would be excused as to plaintiffs' claim, PBGC's motion to dismiss Count I of plaintiffs' complaint is denied.

## B. Count II—Failure To State a Claim Upon Which Relief Can Be Granted

PBGC argues that Count II should be dismissed for failure to state a claim upon which relief can be granted because (1) PBGC was not a fiduciary to the Products Plan at the time of the asset transfer; (2) its actions were specifically authorized by ERISA; and (3) the transfer did not bene-

---

*vision v. F.C.C.,* 59 F.3d 1249, 1256 (D.C.Cir. 1995), *cert. denied,* 516 U.S. 1072, 116 S.Ct. 773, 133 L.Ed.2d 726 (1996)). Nevertheless, PBGC does not argue that it should be allowed to interpret and apply the statutory provisions at issue in Count II, even though Count II also involves an asserted statutory violation. *See infra* Part B. In light of PBGC's disparate application of the exhaustion requirement to the statutory claims in this case, as well as the lack of any indication in ERISA or its legislative history that Congress intended the exhaustion requirement to apply to claims of statutory violations, the Court finds it unnecessary to accord PBGC the deference it now seeks.

6. PBGC argues that complex factual issues are involved in this case which are better suited, as an original matter, for administra-

tive review; according to PBGC, if the amendment eliminating LPBs is invalid, plaintiffs' right to those benefits under the terms of the Products Plan will depend on when the McLouth Products plants were permanently shut down. *See* Def.'s Reply at 2 & n. 4. Nevertheless, on the basis of the record before it, the Court does not find this issue to be any more complex than other factual issues routinely adjudicated in a judicial forum.

7. Since filing their motion to dismiss, PBGC has offered to review plaintiffs' LPB claims *en masse* before issuing IDLs. *See* Def.'s Reply at 1–2. Nevertheless, inasmuch as PBGC's greater willingness to consider plaintiffs' claim appears to have been prompted by plaintiffs' initiation of this litigation, the Court finds that it has no bearing on the futility prong of the exhaustion analysis.

fit McLouth Products. PBGC's arguments are unavailing.

At the outset, the Court finds it necessary to clarify the nature of plaintiffs' claim. Count II of plaintiffs' complaint alleges that "[t]he payment of $12.7 Million in Plan assets to the PBGC benefitted McLouth by reducing the amount owed to the PBGC by McLouth. The payment was thus a prohibited transaction in violation of § [406] of ERISA, 29 U.S.C. § 1106." Compl. ¶¶ 68–69. In their opposition brief, however, plaintiffs appear to expand their theory as to the source of the alleged statutory violation; plaintiffs now allege that McLouth Products received "approximately $13 million in tax credits or waivers and also had the PBGC's liens [on its assets] removed, as part of a transaction in which McLouth Products caused the Products Plan to pay $12.7 million to the PBGC, and in which the Plan was unlaw-

fully amended to eliminate accrued benefits and thereby free up funds to enable the rest of the transaction."[8] Pls.' Opp'n at 16. Plaintiffs contends that this transaction is prohibited by ERISA § 406(b)(2) and (3), because McLouth Products, a fiduciary to the Products Plan, received consideration for its own personal account in dealing with the PBGC in a transaction involving plan assets.[9] *See* Pls.' Opp'n at 16.

■ PBGC argues that Count II should be dismissed because ERISA does not hold fiduciaries liable for breaches of fiduciary duty committed before becoming fiduciaries, *see* 29 U.S.C. § 1109(b); at the time of the $12.68 million asset transfer, PBGC had not yet become a fiduciary of the Products Plan.[10] *See* Def.'s Statement of Points and Authorities in Support of Motion at 10. Nevertheless, plaintiffs do not seek to hold PBGC retroactively liable

---

**8.** PBGC notes that plaintiffs have abandoned the theory espoused in their complaint as to how McLouth Products benefitted from the asset transfer; Count II alleges that the company benefitted from the transfer because the transfer reduced the amount it owed PBGC, whereas plaintiffs' opposition brief asserts that the company benefitted from the transfer because it received tax credits or waivers and the removal of PBGC's liens on its assets. "[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Morgan Distributing Co., Inc. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir.1989) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). Nevertheless, it is also well-established that a complaint must be liberally construed and in a manner most favorable to the plaintiff. *See Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983). The Federal Rules of Civil Procedure do not require a plaintiff "to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99 (quoting Fed.R.Civ.P. 8(a)(2)); *accord Sinclair,* 711 F.2d at 293. The Court finds that, although the complaint sets forth a different theory as to how McLouth Products benefitted from the asset transfer than plaintiffs' opposition brief, it provided PBGC with fair notice of the "clari-

fied" claim plaintiffs now assert because it identified the allegedly prohibited transaction and the general nature of the alleged statutory violation—that McLouth Products benefitted from the transaction.

**9.** Sections 406(b)(2) and (3) of ERISA state:

A fiduciary with respect to a plan shall not … (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b)(2) and (3).

**10.** As relevant here,

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, … or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21). PBGC did not become a fiduciary to the Products Plan until August 1996, when the plan terminated and PBGC became statutory trustee.

for a breach of a fiduciary duty. Rather, the crux of plaintiffs' claim is that PBGC knowingly assisted McLouth Products—a fiduciary of the Products Plan at the time of the asset transfer—engage in a transaction prohibited by ERISA § 406(b)(2) and (3). Courts have recognized a cause of action for equitable relief against a nonfiduciary for participation in a prohibited transaction under ERISA § 406. *See, e.g., LeBlanc v. Cahill,* 153 F.3d 134, 151–153 (4th Cir.1998); *Herman v. S.C. Nat'l Bank,* 140 F.3d 1413, 1422 (11th Cir.1998); *Landwehr v. DuPree,* 72 F.3d 726, 734 (9th Cir.1995). Of direct relevance here, the Fourth Circuit has held that a nonfiduciary can be held liable for knowingly participating in a transaction prohibited by § 406(b)(2) and (3). *See LeBlanc,* 153 F.3d at 151–153. Accordingly, PBGC's status as a nonfiduciary at the time of the $12.68 million asset transfer does not warrant dismissal of Count II.

■ Nor do PBGC's remaining two arguments compel the Court to dismiss Count II. PBGC argues that its actions were specifically authorized by ERISA because, as statutory trustee for the Hourly Plan, it was empowered to "require the transfer of all (or any part) of the assets and records of the plan to [it]self as trustee." 29 U.S.C. § 1342(d)(1)(A)(ii). Because the $12.68 million of assets were part of the spin-back of assets from the Products Plan to the Hourly Plan, PBGC argues that it was authorized to receive the asset transfer. PBGC also argues for dismissal of Count II on the ground that McLouth Products could not have benefitted from the asset transfer because, by decreasing the Products Plan's assets, McLouth Products actually increased the amount of its unfunded benefit liabilities. Nevertheless, both of PBGC's arguments ignore that portion of plaintiffs' (now clarified) claim alleging that McLouth Products received $13 million in tax credits or waivers, and the removal of liens on its assets, as part of a *quid pro quo* for the asset transfer.[11] Although PBGC has shown that it was authorized to receive moneys owed to the Hourly Plan, it has not explained how its role as statutory trustee of the Hourly Plan authorized it to engage in the form of *quid pro quo* alleged by plaintiffs. Nor has PBGC explained why the alleged tax credits or waivers and lien removal—if actually part of the asset transfer agreement—did not benefit McLouth Products.[12] Thus, at this stage

---

**11.** Plaintiffs have submitted affidavits from two union officials—the President and Recording Secretary—which state that, during a meeting of the Union, McLouth Products, and PBGC in the fall of 1995, they were informed of an agreement in which the PBGC would remove the liens it held on McLouth Products's assets in exchange for the asset transfer. *See* Pls.' Opp'n, Ex. H; Pls.' Surreply, Ex. A. The affidavit of the Union President also states that McLouth Products would receive a large tax credit as part of this agreement. *See* Pls.' Opp'n, Ex. H. PBGC argues that these two affidavits must be disregarded because plaintiffs have not submitted a copy of the agreement referred to in the affidavit; Rule 56(e) states that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Fed.R.Civ.P. 56(e). Nevertheless, plaintiffs allege that the alleged portion of the agreement pertaining to the tax credits or waivers and lien removal was never documented in writing. *See supra* note 2. In light of this allegation, the Court will not strike the two affidavits from the record on this motion.

**12.** Plaintiffs' counsel submitted an affidavit pursuant to Federal Rule of Civil Procedure 56(f) stating that he is unable to respond adequately to PBGC's motion because PBGC has denied his requests to depose two PBGC employees who worked on matters related to McLouth Products in the fall of 1995; plaintiffs' counsel wishes to depose these individuals in order to probe the extent of the benefits McLouth Products received in connection with the asset transfer. However, plaintiffs already have submitted two affidavits alleging how McLouth Products benefitted from the transfer. *See supra* note 10. In the absence of any documents submitted by PBGC controverting the substance of those affidavits, the Court concludes that plaintiffs have sustained their burden of establishing a genuine issue of material fact with respect to whether PBGC knowingly participated in a prohibited transaction under ERISA § 406. Thus, it need not consider plaintiffs' Rule 56(f) application.

of the litigation, the Court concludes that the alleged tax credits or waivers and lien removal constitute a genuine issue of material fact, and that PBGC is not entitled to judgment as a matter of law. Accordingly, PBGC's motion with respect to Count II is denied.

## CONCLUSION

For the foregoing reasons, PBGC's motion to dismiss plaintiffs' complaint is denied.