Vicki SIDOU, M.D., Plaintiff

v.

**UNUMPROVIDENT CORPORATION,
et al., Defendants**

No. CIV.01–147–B–K.

United States District Court,
D. Maine.

Feb. 7, 2003.

Frank T. McGuire, Esq., Brent A. Singer, Esq., Rudman & Winchell, Bangor, for Vickie Sidou, MD, plaintiff.

Byrne J. Decker, Esq., Pierce, Atwood, Portland, for New England Financial, Paul Revere Life Insurance Company, Unum Life Insurance Company of America, defendants.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Plaintiff Vicki Sidou, M.D., has filed suit seeking, among other things, judicial review of various determinations made by the Defendants in connection with Dr. Sidou's requests for disability benefits. One of the principal defendants, The Paul Revere Life Insurance Company ("Paul Revere"), has moved to dismiss the principal claim against it on the ground that Dr. Sidou failed to exhaust internal administrative remedies prior to filing suit. Paul Revere has also moved to dismiss the remaining claims against it based on the doctrine of ERISA preemption. In opposition, Dr. Sidou argues that her claim for benefits should be deemed denied, and therefore ripe for review, because of unreasonable and excessive delay on Paul Revere's part, including delay beyond the administrator's self-imposed deadlines. By way of her own, affirmative motion, Dr. Sidou also asks the Court to rule at this juncture that Paul Revere's deemed denial is subject to *de novo* review. I now deny Paul Revere's Motion to Dismiss with respect to Counts I and II and deny Paul

Revere's Motion for Remand. I also now grant Dr. Sidou's Motion for Determination of Standard and Scope of Review, with the qualification that Paul Revere's determination will be reviewed under the so-called "arbitrary and capricious" standard.

### Procedural Posture

■ Paul Revere captions its motion as a "Motion to Dismiss." Pursuant to Rule 12(b), there are seven categories of defenses that may be first raised by motion, including a motion to dismiss for failure to state a claim. Normally, when a court considers a Rule 12(b) motion to dismiss, it does so based solely on the pleadings. Rule 12(b) provides an exception, however, for motions "asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted." When 12(b)(6) motions are presented, the court can consider "matters outside the pleadings." Fed. R.Civ.P. 12(b). Neither party has addressed whether Paul Revere's "failure to exhaust" argument amounts to a 12(b)(6) motion as opposed to, for example, a subject matter jurisdiction challenge.[2] Furthermore, Paul Revere's motion, if treated as a 12(b)(6) motion, is tardy. Paul Revere has already filed its Answer to Dr. Sidou's Amended Complaint and Rule 12(b) motions "shall be made before pleading." *Id.*

In any event, Dr. Sidou has not objected to Paul Revere's motion on this ground and her own filings are filled with numer-

---

**1.** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

**2.** The United States District Court for the District of Columbia has ruled that the failure to exhaust internal remedies defense is a 12(b)(6) matter. *Coleman v. Pension Benefit Guar. Corp.,* 94 F.Supp.2d 18, 21 n. 4 (D.C. 2000) (ruling that failure to exhaust is a

12(b)(6) ground for dismissal because exhaustion of internal remedies under ERISA "is not a prerequisite to a court's exercise of jurisdiction, but rather a matter of judicial discretion"). *Cf. McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs.") (citations omitted).

ous record citations[3] that go beyond the material allegations of the Amended Complaint. For this reason, I construe Paul Revere's motion as a motion for judgment on the pleadings, pursuant to Rule 12(c), which permits me to consider matters beyond the pleadings in a motion filed after the defendant's answer.

## Facts

Because I treat Paul Revere's Motion as a motion for judgment on the pleadings, but gather the facts from more than just the pleadings, it is appropriate to construe those facts pursuant to the summary judgment standard, see Fed.R.Civ.P. 12(c), which means that I will interpret them in the light most favorable to Dr. Sidou in circumstances where the materials are reasonably subject to more than one interpretation. *Fireman's Ins. Co. v. Todesca Equip. Co.*, 310 F.3d 32, 34 (1st Cir.2002).

The parties are in agreement that the Plaintiff, Dr. Sidou, is entitled to receive long term disability benefits, under a certain Paul Revere Group Policy, for a disabling health condition she has suffered with since June 1996. The central dispute between Dr. Sidou and Paul Revere concerns whether Dr. Sidou's disability is caused by or contributed to by a mental disorder. If it is, then her benefits expired sometime in late 1998 or early 1999. The pending motions do not call upon the Court to resolve that issue at this time. Instead, the pending motions address only whether Dr. Sidou exhausted her administrative remedies and, if so, what standard of review the Court should apply when it comes time to review Paul Revere's determination of her claim and subsequent appeal. The following facts are material to these questions.

In June 1996, while employed as an anesthesiologist by Northeast Anesthesia Professional Association ("Northeast"), Dr. Sidou developed a condition that caused her treating physician to conclude that Dr. Sidou could not continue to perform her duties on a full time basis. Dr. Sidou and Northeast reduced her work schedule accordingly. At the time, Dr. Sidou was an eligible participant in a certain Northeast employee disability benefit plan identified as Paul Revere Group Policy No. G–86014, a group insurance policy both issued and administered by Paul Revere. As an eligible plan participant, Dr. Sidou was entitled to partial disability benefits if she could not perform all of the important duties of her occupation on a full time basis and was earning less than 80% of her prior earnings. Dr. Sidou applied to Paul Revere for disability benefits in December 1996, following the reduction in her work schedule at Northeast. Paul Revere denied Dr. Sidou's claim for disability benefits by letter dated June 13, 1997 on the ground that there was insufficient evidence of a disability.

Meanwhile, in September 1996, Dr. Sidou's employer changed from Northeast Anesthesia Professional Association to Spectrum Medical Group, Northeast Anesthesia Division ("Spectrum"). On August 27, 1997, Dr. Sidou filed an appeal of Paul Revere's denial of her claim for disability benefits under the Paul Revere Group Policy. Roughly two months later, in a letter dated October 6, 1997, Paul Revere responded that it had reviewed her appeal and found "no medical evidence and no basis for any limitations" in Dr. Sidou's ability to perform her occupation. (1–317.) Based on this assertion, Paul Revere denied Dr. Sidou's appeal. A one-sentence

---

**3.** Both parties provide factual statements drawn primarily, if not exclusively, from an

"administrative record."

paragraph in the letter informed Dr. Sidou, "This is our final determination with regards to this claim." (*Id.*)

Subsequently, in or about October 1998, Dr. Sidou's symptoms became more severe. On or about October 6, 1998, Spectrum placed Dr. Sidou on medical leave. In December 1998, Stephanie R. Lash, M.D., diagnosed Dr. Sidou's condition as neurally mediated syncope, a type of primary autonomic dysfunction that is classified as an "organic disease." (4–39; 6–106.) In light of this diagnosis, Dr. Sidou again asked Paul Revere to reconsider her earlier claim for disability benefits. In early 1999, Dr. Sidou submitted a claim on a form bearing the designation of New England Financial, which Paul Revere characterizes as a claim made both to it and to New England Financial.[4] Dr. Sidou intended with her 1999 claim to recover benefits not only for present and future lost wages, in light of the December 1998 diagnosis, but also benefits extending back to her initial, 1996 claim under the Paul Revere Group Policy. On March 9, 1999, counsel for Dr. Sidou faxed a letter to a New England representative in which he stated that Dr. Sidou had been diagnosed by Horacio Kaufmann, M.D., as having "primary autonomic dysfunction, characterized as neurally mediated syncope," and that "[w]e wish to do whatever is necessary to renew Dr. Sidou's application for partial disability benefits under the Paul Revere policy." (4–50, 51.) Enclosed with the letter were copies of both Dr. Lash's December 1998 report and Dr. Kaufmann's January 1999 report. According to counsel for Dr. Sidou, "The gist of these reports is that Dr. Sidou's symptoms since at least the fall of 1996 are attributable to this syndrome." (4–50.)

In a letter dated March 11, 1999, Janice H. King wrote to Dr. Sidou and acknowledged receipt of the 1999 claim form. Ms. King's signature line indicated that she was a senior claim representative for New England Financial. It did not indicate that she was an employee or agent of Paul Revere. However, regarding Dr. Sidou's request that her claim be considered back to 1996 under the Paul Revere Group Policy, Ms. King stated:

> We will consider our liability back to that date, but to be of service to you, we will open the claim October 6, 1998 and proceed from there so that any benefits that come due under that part of the claim may be paid promptly. Should we be able to approve the claim back to 1996, appropriate adjustments would be made.

(4–44.) At this time, Ms. King began to gather medical records in order to review the claims, including treatment summaries from Dr. Sidou's psychologist, Joan Settin, Ph.D. Dr. Settin, in accordance with her practice, refused to release her personal notes taken during the therapy process. Nevertheless, Ms. King, with the aid of a medical consultant and a cardiac consultant, reviewed these materials and others subsequently submitted by Drs. Settin and Wood, and concluded that Dr. Sidou *had* been disabled as early as September 1996, but that the disability was caused or contributed to by "stress and anxiety" and was therefore subject to an "Other Limitations" provision in the Paul Revere Group Policy. This provision imposes a two-year limit on the payment of benefits where, among other things, a "mental disorder"

---

4. Paul Revere, UNUM Life and New England Financial are all related entities under the UnumProvident umbrella. In addition to the Paul Revere Group Policy, Dr. Sidou submitted claims for disability benefits to New England Financial under several private disability insurance policies.

causes or contributes to the disability at issue. In effect, Paul Revere reversed its prior denial of the claim, but limited benefits to two years. Ms. King informed Dr. Sidou of this determination in a letter dated December 14, 1999. Ms. King's letter also informed Dr. Sidou that any appeal should be sent within 90 days and that "The Claims Department" would make its final determination within 60 days of receipt of an appeal. This letter clearly indicated that Ms. King was a "Senior Claims Representative" for both "The Paul Revere Life Insurance Company and The New England Disability Claims Unit." The return address indicated on the letter:

The New England Claim Unit/Paul Revere Group Claims

Quality Performance Support, 700–19

18 Chestnut Street

Worcester, MA 01608

Dr. Sidou, through counsel, appealed this determination in a March 20, 2000 letter.[5] Dr. Sidou's appeal was supported, in part, by a 26–page "Comprehensive Psychiatric Evaluation" conducted by David J. Bourne, M.D., based on Dr. Sidou's past treatment histories and reports and an examination conducted by Dr. Bourne on February 17, 2000. Ms. King responded in a letter dated April 12, 2000 that the appeal had been received and that it would be further reviewed by psychiatric and medical consultants due to the inclusion of Dr. Bourne's evaluation.

Ms. King referred the file to a psychological consultant, Alex W. Unsprung, Ph. D., who reviewed the entire file and concluded that Dr. Bourne's evaluation was "compelling." His conclusions regarding the cause of Dr. Sidou's disability included the following:

Even if a case can be made that Dr. Sidou's syncopal episodes are being triggered by psychological factors, ... I would suggest that the problem is still not so much psychological as it is a matter of an abnormal physiological response, and the condition is thus physical, not psychological.... [Dr. Sidou] appears to react in psychologically normal and healthy ways, but may have abnormal physiological responses.

(6–219, 220.) Dr. Ursprung conveyed these conclusions to Ms. King by way of a memorandum dated May, 10, 2000, which was at least ten days prior to the expiration of the 60–day, self-imposed deadline for adjudicating Dr. Sidou's appeal. However, allegedly harboring concerns that Dr. Ursprung had relied too heavily on Dr. Bourne's evaluation, and that Dr. Bourne had in turn relied too heavily on Dr. Sidou's "self report" and Dr. Settin's summaries, Ms. King attempted more than three weeks later to refer the file to a second psychological consultant identified only as "Dr. Cusher." According to a hand-written notation penned by Ms. King on June 7, 2000, Dr. Cusher asked Ms. King to obtain Dr. Settin's notes before referring the file to him. Recognizing that the 60–day deadline was at hand, Ms. King notified Dr. Sidou in a June 7, 2000 letter that an extension of time was required, stating, "You will be notified of our decision no later than July 19, 2000." (7–3.) Ms. King also requested a fresh authorization form to obtain Dr. Settin's notes. Shortly thereafter, Dr. Sidou's counsel relayed Dr. Sidou's desire to cooperate in the request for information, but did not send an authorization form to expedite matters.

As of August 8, 2000, Paul Revere had walked past the July 19, 2000 self-imposed deadline and had still not obtained Dr. Settin's notes. Ms. King called Dr. Sidou's counsel's office on August 8, 2000 and ad-

---

5. Ms. King agreed to provide Dr. Sidou with additional time to file her appeal.

vised that the deadline would be extended once again. This call was followed up with a letter advising that a further 60–day extension would be taken. On September 12, 2000, Ms. King left a voice mail message for Dr. Settin and Dr. Settin responded the same day with a message that she would not produce her notes. On October 27, 2000, Ms. King sent an authorization form to Dr. Sidou's counsel under cover requesting that Dr. Sidou sign and return the same as soon as possible. Dr. Sidou, not exhibiting any great haste on her own part, signed the authorization form on November 10, 2000 and her counsel returned the signed form in a letter dated November 13, 2000. Ms. King forwarded the same to Dr. Settin in a letter dated November 17, 2000, in which she requested Dr. Settin's treatment notes. According to one of Ms. King's phone memos, she then called Dr. Settin on November 27, 2000 and was informed that Dr. Settin had sent her notes to Ms. Sidou's counsel two months prior. Dr. Settin followed this communication with a letter, in which she explained that she had forwarded her notes to Dr. Sidou's counsel sometime in July 2000 and that he had returned them sometime thereafter. The next day, November 28, 2000, Dr. Sidou's counsel forwarded the notes to Ms. King. In his cover letter, counsel requested that "the company act within thirty (30) days to grant the appeals and approve benefits to Dr. Sidou." (7–101.)

Rather than forwarding Dr. Settin's notes to Dr. Cusher, Ms. King sent the notes to Dr. Ursprung for a follow up review of the file. Dr. Ursprung reviewed the file for a second time on January 19, 2001, and concluded that, based on his review of Dr. Settin's notes,[6] his former reliance on Dr. Bourne's evaluation had been misplaced. Based on Dr. Settin's notes, Dr. Ursprung flatly opined that "there is a strong psychological contribution to Dr. Sidou's somatic symptoms." (7–164.) On January 31, 2001, Ms. King sent Dr. Sidou's counsel a letter requesting another 60–day extension explaining that the file was "being reviewed by both our [m]edical and [p]sychiatric [c]onsultants." (7–171.) In a subsequent February 28, 2001 letter, Ms. King informed Dr. Sidou's counsel that Paul Revere had concluded "that an independent cardiac and psychiatric examination be conducted ... in an effort to resolve the question as to the nature or cause(s) of Dr. Sidou's condition." (7–196.) According to Ms. King:

> The focal point of our disagreement ... is whether [Dr. Sidou's] stress and anxiety has caused or contributed to the condition for which she claims residual disability.... As discussed in our decision letter ... of December 14, 1999, we determined that the condition for which Dr. Sidou makes claim is caused or contributed to by stress and anxiety, and the bases for our decision is discussed fully in that letter.

(7–192.) Dr. Sidou refused to undergo further examination[7] and, following a course of correspondence between her counsel and inhouse counsel for UnumProvident, filed suit in July 2001.

---

**6.** Regardless of what her notes reflected, Dr. Settin's evaluation was that "[t]he more fully over time the medical picture emerged, the clearer it became that the Adjustment Disorder developed primarily in response to the stress of having the medical condition, and not the other way around." (6–146.)

**7.** Although it is fair to conclude that Dr. Sidou consented to an extension for the limited purpose of permitting Paul Revere to review Dr. Settin's treatment notes, Dr. Sidou repeatedly informed Paul Revere that she was not waiving her rights under the Group Policy in relation to the applicable deadlines.

## Discussion

Paul Revere moves for dismissal of Count I on the ground that Dr. Sidou failed to exhaust administrative remedies before filing suit. Dr. Sidou asks the Court to deny this motion and further requests that the Court strike Dr. Settin's treatment notes from the record and review Paul Revere's claims determination *de novo*. For the reasons that follow, I conclude that Count I is ripe for judicial review, that the administrative record includes Dr. Settin's treatment notes, and that Paul Revere's determination must be reviewed under the arbitrary and capricious standard. Paul Revere also moves for dismissal of Counts II and III on the grounds of ERISA preemption. I construe Count II as an ERISA claim, not as a preempted state law claim, and dismiss Count III without analysis because Dr. Sidou concedes that it is preempted.

### A. Dr. Sidou's Request for Judicial Review is Ripe.

 Count I is premised on ERISA's civil enforcement provision, 29 U.S.C. § 1132, which provides a cause of action for a plan participant or beneficiary "to recover benefits due ... under the terms of his [or her] plan." 29 U.S.C. § 1132(a)(1)(B). Paul Revere argues that its review of Dr. Sidou's appeal was cut short by Dr. Sidou's refusal to undergo independent medical examinations and, as a result, this claim must be dismissed for failure to exhaust administrative remedies.

The Paul Revere Group Policy language concerning independent medical examinations reads as follows:

## OUR RIGHT TO REQUIRE EXAMS

We have the right to require an exam of any claimant as often as it may be required reasonably. The examination may be performed by a physician or vocational expert of Our choice. Any such exam will be at Our own expense.

(1–47.) However, in addition to this provision, Paul Revere also informs beneficiaries in its plan documents that:

In *no instance* ... will the final decision [on an appeal] be made more than 120 days after the date Your appeal was received.... If a decision ... is not furnished ... within the time frames set forth above, the claim shall be deemed denied on review."

(1–88 (emphasis added).) Presumably, it was in accordance with this provision that Ms. King stated in her June 7, 2000 letter, "You will be notified of our decision no later than July 19, 2000." (7–3.) According to Paul Revere, its request to conduct examinations was reasonable [8] under the circumstances, even though it was made after the 120–day time limit had expired. I disagree.

If the 120–day provision is applied, a "deemed denial" of Dr. Sidou's appeal would have arisen at the end of July 2000, several months before Paul Revere re-

---

8. Paul Revere actually argues that the Court should defer to its decision to request independent examinations because that decision was not arbitrary and capricious. In my view, a debate over whether the request was "reasonable" or "arbitrary" would serve no purpose in the context of this record. *See Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999) ("It seems to us that the requirement that [an insurer-administrator's] decision be 'reasonable' is the basic touchstone in a case of this kind and that fine gradations in phrasing are as likely to complicate as to refine the standard."); *Cook v. Liberty Life Assur. Corp. of Boston*, 320 F.3d 11 (1st Cir.2003) ("In order to arrive at [a conclusion that the administrator's decision was arbitrary and capricious,] we would have to find that the insurer's eligibility determination was unreasonable in light of the information available to it.") (internal quotation marks and citation omitted).

quested the follow up examinations. Paul Revere contends that this delay should be overlooked because of alleged stalling tactics on the part of Dr. Sidou's counsel in relation to producing Dr. Settin's notes. On the contrary, Paul Revere's quest for Dr. Settin's treatment notes is beside the point. The point is that from Dr. Sidou's March 20, 2000 appeal until roughly February 28, 2001, the date of Ms. King's letter requesting examinations, Paul Revere was entirely content to limit its review of Dr. Sidou's claim to a review of Dr. Bourne's evaluation. In fact, even the quest for Dr. Settin's notes commenced only after Dr. Ursprung, Paul Revere's chosen expert, looked favorably upon Dr. Bourne's evaluation. But even at that point, Ms. King did not seek an independent examination, but instead intended to refer Dr. Bourne's evaluation to a second expert, Dr. Cusher, who requested the notes simply to assist him in his review of Dr. Bourne's evaluation. It was shortly thereafter that Ms. King promised the July 19, 2000 deadline in her letter dated June 7, 2000. With only a six-week window remaining for Ms. King to (1) acquire Dr. Settin's notes; (2) refer them, along with the claim file, to Dr. Cusher; (3) have Dr. Cusher review the materials and issue his report; (4) review Dr. Cusher's report; (5) request and schedule independent examinations, if desired; (6) receive any re-

ports arising from independent examinations; and (7) draft and issue her final determination in consultation with her independent experts, Paul Revere's contention that missed deadlines were solely occasioned by the acts of Dr. Sidou and her counsel is inappropriate. The obvious inference is that Ms. King considered the basis for her December 1999 determination to be sound independent of any further evidence, let alone evidence obtained by means of independent examinations. Although Paul Revere now insists that independent examinations are called for, its request simply comes too late. While it would have been reasonable for Paul Revere to request an independent examination shortly after receiving Dr. Bourne's evaluation, or at any earlier time during the pendency of Dr. Sidou's claim, it chose not to until almost a year after Dr. Sidou submitted her appeal.

In my view, any relative utility in conducting an independent examination should have been apparent to Paul Revere well before Dr. Settin's notes surfaced. Yet, until February 2001, Paul Revere never requested an examination of Dr. Sidou in relation to her claim, choosing instead to deny and eventually approve her claim—subject to the mental disorder limitation—based exclusively on materials produced by Dr. Sidou, including Dr. Settin's reports.[9]

9. Of course, the ultimate utility of conducting an independent examination at this late date, not to determine Dr. Sidou's present condition, but rather to determine whether a mental disorder caused or contributed to her workplace disability, appears dubious, at best. In any event, Paul Revere's suggestion that the appropriateness of conducting independent examinations was not apparent until Dr. Settin's treatment notes were reviewed is specious. Although not recounted in the fact section of this decision, in both 1996 and 1997, prior to the worsening of Dr. Sidou's condition in late 1998 and her contemporaneous evaluation by Dr. Lash, Paul Revere re-

lied for its denial of Dr. Sidou's claim, in part, on statements found in Dr. Settin's reports. For example, in her October 1997 "final determination," Paul Revere's then "Senior Group Claim Examiner," Rhonda Lamothe, relied in part on a statement by Dr. Settin that Dr. Sidou's symptoms were "transient and expectable reactions to psycho-social stresses." (1–319.) In other words, it has been the position of Paul Revere for more than five years that Dr. Settin's pre–1998 findings are relevant to a determination of Dr. Sidou's claim. Yet Paul Revere did not insist on obtaining Dr. Settin's notes until June 2000 and did not request examinations until

I certainly acknowledge that valid reasons may exist for Paul Revere to conduct subsequent independent medical examinations for purposes of periodically reviewing a claimant's disability status. However, it is clear in this case that the only purpose of the requested examinations was to develop a factual record for purposes of determining an appeal after the applicable deadline for reviewing the appeal had expired. Although the rules of administrative claims review are sufficiently loose to permit supplementation of the record during the course of a review, it is simply unreasonable to request that a claimant submit to medical examinations *after* the applicable deadline for ruling on her appeal has expired when the sole reason for the independent medical examination can only be to supplement a final decision that has already been made. Under these circumstances, Paul Revere's request for further examinations was unreasonable and therefore not permitted by the policy provision upon which Paul Revere relies.

The question remains whether Dr. Sidou's claim under the Paul Revere Group Policy should be remanded so that Paul Revere might yet issue a final determination. According to Paul Revere, the Court must remand the case because Dr. Sidou failed to exhaust her administrative remedies. But the failure to exhaust administrative remedies is not a jurisdictional bar, and because Congress has not mandated exhaustion in the context of § 1132 claims for judicial review, "sound judicial discretion governs." *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117

L.Ed.2d 291 (1992); *see also Bourgeois v. Pension Plan for the Employees of Santa Fe Int'l Corps.*, 215 F.3d 475, 481 (5th Cir.2000) ("[A] court should not relinquish its jurisdiction because of a failure to exhaust administrative remedies when there was a valid reason for such failure.").[10] Under the circumstances of this case, I deem Dr. Sidou's claim for disability benefits as denied and decline Paul Revere's invitation to remand the matter for "final determination" by Paul Revere. Not only do the plan documents provide for a deemed denial of Dr. Sidou's appeal after 120 days, but the Department of Labor's ERISA regulations also indicate that 120-days is an appropriate limit on Paul Revere's administrative tenure. Indeed, the Supreme Court has construed the regulation that applies in this case, 29 C.F.R. § 2560.530–1(h)(4), as "enabl[ing] a claimant to bring a civil action to have the merits of [her] application determined, just as [she] may bring an action to challenge an outright denial of benefits." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). *See also Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Prot. Plan,* 310 F.3d 1173, 1180 (9th Cir.2002) ("[W]here the plan itself provides that a particular procedural violation results in an automatic decision ... that provision is as enforceable as the provision giving the administrator discretionary authority under other circumstances.") (Tashima, J., dissenting); *Somme v. Burton,* 1998 U.S. Dist. LEXIS 74, *14, 1998 WL 249224, *5 (E.D.La. May 18, 1998) ("CIGNA's untimely response to plaintiff's re-

February 2001. In this light, Paul Revere's request for independent examinations appears to be motivated by something other than Dr. Settin's notes.

**10.** The "failure to exhaust" authorities cited by Paul Revere are readily distinguishable from the facts of this case. *See, e.g., Robyns v.*

*Reliance Standard Life Ins. Co.,* 130 F.3d 1231, 1232 (7th Cir.1997) (involving "a classic case of jumping the gun"). Even its principal case, *Heffernan v. UNUM Life Ins. Co.,* is consistent with my decision. 2001 WL 1842465 (S.D.Oh.2001).

quest for an appeal results in a 'deemed' denial of the appeal and therefore, an automatic exhaustion of the appeals process."). I deem Dr. Sidou's appeal as denied and, by extension, conclude that Dr. Sidou exhausted her administrative remedies.

**B. Paul Revere's December 14, 1999 Determination is Reviewed Under the Arbitrary and Capricious Standard.**

"[T]he Supreme Court has determined that 'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Terry v. Bayer Corp.,* 145 F.3d 28, 37 (1st Cir.1998) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The First Circuit instructs that courts in this Circuit must "steadfastly" apply *de novo* review unless the benefits plan "clearly grant[s] discretionary authority to the administrator." *Id.* Dr. Sidou asks the Court to rule at this time that *de novo* review is the appropriate standard for reviewing Paul Revere's determination. In order to determine this question, it is appropriate to start with the relevant plan language. Paul Revere offers the following in support of an abuse of discretion standard of review:

> The Paul Revere Life Insurance Company is the Claims Administrator for benefits contained in the group policies it has issued to Your employer. As such, it

has the full, final, conclusive and binding authority to construe and interpret any of its group insurance policies that provide benefits under Your employer's welfare benefit plan as may be necessary to make any and all decisions and determinations under such policies. A decision of the Claims Administrator shall not be overturned unless it is arbitrary and capricious or unless there is no rational basis for the decision.

(1–85.) This language is not drawn from the Group Policy. Instead, it is found in the "Important Notice" portion of a "Summary Plan Description" document ("SPD") that Paul Revere distributed to beneficiaries.[11] Paul Revere has not offered any relevant language from the Group Policy itself.

Dr. Sidou argues that the language of the SPD does not clearly confer discretionary authority on Paul Revere because the word "discretion" is not used and because whatever authority is given, it is only "to construe and interpret" plan provisions, not to find facts and adjudicate claims. The absence of the word "discretion" is not conclusive. As the First Circuit has warned, there are no "magic words." *Brigham v. Sun Life of Canada,* 317 F.3d 72 (1st Cir.2003). Dr. Sidou is correct, however, that the requisite statement of authority cannot be found in the second sentence of the foregoing SPD provision. Still, I find a grant of discretionary authority does exist in the third sentence, which indicates, "A decision of the Claims Administrator shall not be overturned unless it is arbitrary and capricious or unless

---

11. The initial page of the SPD reads:
Nothing in this booklet waives or alters any of the terms or conditions of the Group Policy. If the terms and conditions given in this booklet-certificate and the Group Policy should differ, the Group Policy will govern. The Paul Revere Life Insurance Company has final decision-making authority to

determine eligibility for benefits and to interpret its Policy as may be necessary in order to make claims determination [sic]. (1–83.) The third sentence appears to convey Paul Revere's discretionary authority even more clearly than the language principally relied on by Paul Revere.

there is no rational basis for the decision." (1–85.) The term with which the third sentence starts, "A decision," can only reasonably be interpreted as referring to "any and all ... determinations" Paul Revere should make in its role as "Claims Administrator." It is unreasonable to treat this term as referring to only those decisions Paul Revere might make in its role as a construer and interpreter of policy language. Such a construction essentially ignores the indication that Paul Revere is a *claims* administrator at all, as opposed to a mere referee of policy language.[12]

▇▇▇▇ Dr. Sidou also contends that, even if a grant of discretionary authority is suggested by the SPD language, that language is ineffectual as a matter of law because it exists only in the SPD, not in the plan master documents. This argument is also unpersuasive. The SPD is a plan document. *See, e.g., Terry,* 145 F.3d at 41 (citing defendant's SPD in support of a finding that "Plan documents" authorized IMEs and a rehabilitation program). Furthermore, an SPD is the one plan document that a plan beneficiary is going to be familiar with. As stated by the Second Circuit, the SPD "is an employee's primary source of information regarding employment benefits." *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 764 (2d Cir. Dec.20, 2002).[13] Even though an SPD is not an "instrument" through which discre-

tionary authority is formally delegated from the plan sponsor to the plan administrator, next to the plan master documents the SPD is *the* best available evidence of such a delegation. After all, SPDs are issued to provide beneficiaries with plain-language-notice of the contents of a plan pursuant to a statutory directive. *See* 29 U.S.C. § 1022; *Bergt v. Ret. Plan for Pilots Employed by Markair, Inc.,* 293 F.3d 1139, 1143 (10th Cir.2002) ("Employers are required to provide participants with a copy of an SPD ....") (citing 29 U.S.C. § 1022(a)). When Paul Revere provided the SPD to plan beneficiaries, it was fulfilling Northeast's statutory obligations. Simply because the plan master documents do not provide for the delegation of final decision-making authority, it does not mean that the plan sponsor has not, in fact, delegated such authority to the administrator.[14] Certainly, the record contains no evidence that Northeast ever exercised any decision-making authority with respect to claims brought under the Paul Revere Group Policy.

It is not lost on me that Paul Revere, as master of the Paul Revere Group Policy, has only itself to blame that this issue is susceptible to litigation. *Firestone* is more than a decade old now and citations in the parties' memoranda reveal that Paul Revere has been a party to ERISA litigation

---

**12.** *See supra* note 11 for additional clear language contained in the SPD but not discussed by the parties.

**13.** In *Mario,* the Second Circuit Court of Appeals considered whether the presence of clear language granting discretionary authority in an administrative services agreement might still be ineffectual because the same language was not found in the related SPD, the opposite of the situation presented here. The Court did not resolve the issue, however, because the administrator's determination

survived even *de novo* review. *Mario,* 313 F.3d at 764.

**14.** I have been unable to find law stating that a delegation of this nature must be made by means of an "instrument" and ERISA itself seems to suggest otherwise. *See* 29 U.S.C. § 1105(c)(1) ("The instrument under which a plan is maintained *may* expressly provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities ... under the plan.") (emphasis added).

more than once since then.[15] Still, I conclude that language in a SPD forms part of "the Plan" for purposes of the *Firestone* analysis. *Firestone* requires the Court to look to the provisions of "the plan," not just the plan master documents. 489 U.S. at 115, 109 S.Ct. 948 ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit *plan* gives the administrator or fiduciary discretionary authority to determine eligibility for benefits.") (emphasis added). The Paul Revere SPD is an integral part of the employee benefit plan at issue here and contains language clearly indicating that Paul Revere is the final decision-making authority with respect to claims for benefits under the Paul Revere Group Policy.

Dr. Sidou's final argument is that, even if the SPD language is sufficient to support application of an arbitrary and capricious standard of review, there is a genuine issue as to whether Paul Revere exercised that discretionary authority through Ms. King. It appears to be clear from the record that Ms. King had final decision-making authority with respect to Dr. Sidou's claim under the Paul Revere Group Policy. Dr. Sidou posits that Ms. King might not be a claims administrator for Paul Revere, only for New England Financial. Dr. Sidou contends that if Ms. King was exclusively an employee of New England Financial, then New England Financial, a non-fiduciary, served as the final authority with respect to her claim and therefore, unless there was an effective delegation from Paul Revere to New England Financial, the *de novo* standard of review must be applied. *See Terry*, 145 F.3d at 37; *see also Davidson v. Liberty Mut. Ins. Co.*, 998 F.Supp. 1, 8–9 (D.Me.1998).

Contrary to Dr. Sidou's contention, the record reflects that Ms. King is a "Senior Claim Representative" for both "The New England Disability Claim Unit" and "The Paul Revere Life Insurance Company." Although it is conceivable that the dual nature of her employment may be a factor to consider when deciding whether her December 14, 1999 decision was arbitrary and capricious,[16] this meager showing does not create a genuine issue concerning whether Paul Revere delegated final decision-making authority to a non-fiduciary. For purposes of Counts I and II, Ms. King's actions and determinations as a senior claim representative were the actions and determinations of Paul Revere.

### C. The Administrative Record Includes Dr. Settin's Notes.

 Having determined the applicable standard of review, and having deemed

---

**15.** Nor is it lost on me that the SPD states that its provisions cannot waive or modify the provisions of the Group Policy. The SPD language discussed in the body of this decision, however, does not conflict with or modify anything in the Group Policy, because the Group Policy is silent on the issue.

**16.** *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948 ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (citation omitted); *Doe v. Travelers*, 167 F.3d at 57 (applying reasonableness standard when reviewing a claim determination made by an insurer-administrator having a financial stake in its own determination). *See also, generally, Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 384–86 (3d Cir.2000) (including a discussion of the approaches adopted by various Circuit Courts of Appeals). One court has even suggested that an administrator's failure to meet the applicable deadline for reviewing a claim could bear some weight in relation to whether its determination deserves affirmation. *See, e.g., Phillips–Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 796 (8th Cir. 2002).

**220**

a denial, the Court must determine the appropriate contents of the administrative record that will be reviewed. The only dispute raised by the parties with respect to what the record might contain, in the event that the Court should deem a denial—which I have—is whether or not the record contains Dr. Settin's notes. Dr. Sidou advocates exclusion; Paul Revere inclusion. Under normal circumstances, the approach would be to limit the record to those materials that were in Paul Revere's claims file at the time it rendered its final determination. *See, e.g., Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir.1999). Here, because the Court deems a denial, it will deem the record closed as of a date contemporaneous with the deemed denial, roughly at the end of July 2000. However, even though Paul Revere did not obtain Dr. Settin's notes until months after the deemed denial date, the record clearly reflects that Dr. Sidou consented to Ms. King's request to obtain and review Dr. Settin's treatment notes. Furthermore, the delay in obtaining the notes was occasioned, in significant part, by the actions of Dr. Sidou and her counsel. For these reasons, I consider the administrative record to include Dr. Settin's treatment notes. What significance the notes might have in relation to the December 1999 claim determination is a topic that can be best addressed in supplemental filings.

### D. ERISA preemption applies only to Count III.

■ Paul Revere moves for dismissal of Count II, styled as a declaratory judgment claim, and Count III, a claim for violations of the Maine Insurance Code, based on the doctrine of ERISA preemption. Dr. Sidou concedes that Count III is preempted but asserts that Count II is not preempted because declaratory relief is expressly authorized by ERISA. Without

belaboring this decision with a discussion of ERISA preemption, I agree with Dr. Sidou that her declaratory judgment claim is not preempted *See* 29 U.S.C. § 1132(a)(1)(B) (empowering persons to bring civil actions to, *inter alia,* clarify his [or her] rights to future benefits); *id.,* § 1132(a)(3) (empowering persons to bring civil actions to, *inter alia,* "obtain other appropriate equitable relief"). Because Dr. Sidou has not captioned Count II as arising out of any particular common law or statutory font, the Court will construe Count II as a request for declaratory relief pursuant to ERISA.

### Conclusion

Paul Revere's Motion to Dismiss is **DENIED** with respect to Counts I and II and **GRANTED** with respect to Count III. Paul Revere's Alternative Motion to Remand is **DENIED**. Plaintiff Dr. Sidou's Motion for a Determination of Standard and Scope of Review is **GRANTED**, but her specific requests for a *de novo* standard and for exclusion of Dr. Settin's notes are **DENIED**. Counsel are further directed to contact my chambers by February 14, 2003, to schedule a status conference to establish a scheduling order to govern this case.

*So Ordered.*